SOMMERS LAW GROUP
STEPHEN A. SOMMERS, SBN 225742
JACOB W. SIDER, SBN 236084
870 Market Street, Ste. 1142
San Francisco, CA 94102
(415) 839-8569 (Tel)
(415) 956-0878 (Fax)
info@sommerslaw.com

Attorneys for Plaintiff
BLUE MARLIN, CORP.

FILED
AUG - 2 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

UNITED STATES DISTRICT COURT

FOR NORTHERN DISTRICT OF CALIFORNIA

C 07 3994 EDL

| | |
|---|---|
| BLUE MARLIN CORP., a California Corporation,<br>Plaintiff,<br>vs.<br>EJAZ DYEING & FINISHING MILLS (PVT) LTD., a business organization, form unknown; and Does 1 through 25 inclusive<br>Defendants. | Case No.:<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES FOR:<br><br>(1) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE<br><br>(2) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE<br><br>(3) NEGLIGENT MISREPRESENTATION<br><br>(4) INTENTIONAL MISREPRESENTATION<br><br>(5) BREACH OF CONTRACT, and<br><br>(6) UNFAIR BUSINESS PRACTICES<br><br>**DEMAND FOR A JURY TRIAL** |

Plaintiff Blue Marlin Corp. (hereinafter, "BLUE MARLIN" or "PLAINTIFF") brings this suit against Defendant Ejaz Dyeing & Finishing Mills (Pvt) Ltd. ("EJAZ"), and Does 1 through 25 (hereinafter collectively referred to as "DEFENDANTS") for (1) negligent interference with

1   prospective economic advantage, (2) intentional interference with prospective economic
2   advantage, (3) negligent misrepresentation, (4) intentional misrepresentation, (5) breach of
3   contract, and (6) unfair business practices.
4       Plaintiff alleges:

## I.   JURISDICTION

6   1.   This Court is the proper Court.
7   2.   This Court has diversity jurisdiction pursuant to 28 USC 1332, as the Plaintiff is a citizen
8   of California and all DEFENDANTS are citizens of the Country of Pakistan.
9   3.   This Court has personal jurisdiction over the EJAZ, as EJAZ has filed suit in California
10  Superior Court in the County of Los Angeles. Further, EJAZ has minimum contracts with the
11  State by doing business with PLAINTIFF in California, taking orders from California, and
12  shipping product to California.
13  4.   Venue is proper in the Court pursuant to 28 U.S.C. § 1391 because the DEFENDANTS
14  reside in this judicial district and/or a substantial part of the events giving rise to the cause of
15  action occurred in this judicial district.

## II.   PARTIES

17  3.   At all material times hereto, Plaintiff BLUE MARLIN has been a California
18  corporation doing business as an apparel wholesaler with its principal place of business located
19  at San Francisco, California.
20  4.   EJAZ is (type of business, where located). EJAZ entered into contract with
21  BLUE MARLIN to manufacture apparel for BLUE MARLIN.
22  5.   The true names or capacities, whether individual, corporate, associate or
23  otherwise, of defendant DOES 1 to 25, inclusive, are unknown to PLAINTIFF, who therefore
24  sues said defendants by such fictitious names. PLAINTIFF is informed and believes and thereon
25  alleges that each of defendants designated herein as DOE is legally responsible in some manner

1  (as the agent, partner and/or employee of DEFENDANT) for the events and happenings herein
2  referred to and in doing the actions mentioned below was acting individually as an agent of
3  DEFENDANT and with the permission and consent of the co-defendants. All actions of each
4  defendant herein alleged were ratified and approved by the other individual defendants and by
5  the officers and managing agents of each other corporate defendant and partnership.

6.  All of the DEFENDANTS were aliases for and/or acting as agents, servants and co-conspirators of and with the knowledge and consent of each other, all within the course and scope of said relationship(s).

### III.  FACTS COMMON TO ALL CAUSES OF ACTION

7.  BLUE MARLIN was founded in 1994 as a headwear wholesaler. Its initial line of product was inspired by teams from the Negro Leagues, the Latin Leagues, the Pacific Coast Leagues, and other defunct baseball teams from the early 1900's. Its early product offering featured baseball caps; these hats were an instant success and were soon worn by various celebrities including Bruce Springsteen, Dusty Baker, Bruce Willis, Bono and others.

8.  Beginning in 1996, BLUE MARLIN expanded into vintage-inspired sportswear consisting of sweatshirts, sweatpants, track jackets, polo shirts, T-shirts, jeans, bags, belts, footwear, and other items. Blue Marlin is currently sold in over 500 stories nationwide including Marshall Field's, Lord & Taylor, Nordstorm and a variety of specialty stores.

9.  On or about August 1, 2006 and August 2, 2006, BLUE MARLIN entered into a series of contracts with DEFENDANTS (hereinafter, the "CONTRACTS") under which DEFENDANTS would manufacture approximately 217,000 NO BOUNDARIES branded tee shirts and hoodies, (hereinafter "GOODS") for the cost of $956,674.80. NO BOUNDARIES is private label owned by Wal-Mart Inc. (hereinafter, "WAL-MART") and the GOODS were specifically to be sold at Wal-Mart Inc. stores. The terms of the CONTRACTS are both written and oral. Attached as Exhibit A is a true and accurate copy of the CONTRACTS.

1    10.    WAL-MART requires suppliers of products in "high risk" categories, including
2  apparel, or suppliers of WAL-MART private label brands to conform to WAL-MART's ethical
3  standards for labor, wage, health, safety, and environmental protection (hereinafter "WAL-
4  MART'S ETHICAL STANDARDS") and participate in WAL-MART's ethical standards
5  program, requiring inspection by WAL-MART or WAL-MART contracted inspectors.

6    11.    In July 2006, BLUE MARLIN and DEFENDANTS negotiated the CONTRACTS
7  through a series of conversations between HUSSAIN, HASAN, and SAIGOL, on the one hand,
8  (who were acting as representatives of MATRIX and EJAZ and are hereinafter referred to as
9  DEFENDANTS' REPRESENTATIVES) and BLUE MARLIN's chief financial officer, Rick
10 Ashley, and account manager, Tom Mayfield, on the other hand.

11   12.    During the negotiations, BLUE MARLIN's representatives told DEFENDANTS'
12 REPRESENTATIVES that the GOODS would be subject to WAL-MART'S ETHICAL
13 STANDARDS and that the factory DEFENDANTS' REPRESENTATIVES designated to
14 produce the GOODS would be subject to inspection by WAL-MART. BLUE MARLIN told
15 DEFENDANTS' REPRESENTATIVES that unless DEFENDANTS could assure BLUE
16 MARLIN that the factory they designated to produce the GOODS was in compliance with WAL-
17 MART'S ETHICAL STANDARDS, BLUE MARLIN would not place orders through
18 DEFENDANTS. DEFENDANTS' REPRESENTATIVES told Ashley and Mayfield that
19 DEFENDANTS had previously done business with WAL-MART and that DEFENDANTS were
20 familiar with WAL-MART's ethical sourcing program. DEFENDANTS' REPRESENTATIVES
21 assured BLUE MARLIN that the factory it would designate to produce the GOODS was and
22 would remain in compliance with WAL-MART'S ETHICIAL STANDARDS.

23   13.    DEFENDANTS' REPRESENTATIVES told Ashley and Mayfield that the
24 factory that would produce its GOODS was EJAZ located in Lahore, Pakistan.

25

1   14.  Based on DEFENDANTS' assurances and representations that DEFENDANTS would insure compliance with WAL-MART'S ETHICAL STANDARDS, BLUE MARLIN placed a series of four orders with DEFENDANTS for production of the GOODS on or about August 1, 2006 and August 2, 2006. DEFENDANTS were to deliver the GOODS on November 24, December 10, December 24 2007, and January 26, 2006. DEFENDANTS understood when they entered into the CONTRACTS with BLUE MARLIN that they would have to adhere to a variety of garment, delivery and packing requirements, as well as the WAL-MART ETHICAL STANDARDS, as indicated on the purchase orders as "APPAREL PERFORMANCE SPECIFICATIONS WILL NEED TO COMPLY TO CURRENT 'WAL-MART STORES APPAREL PERFORMANCE SPECIFICATIONS'."

15.  In or around November 2006, WAL-MART notified DEFENDANTS that it intended to inspect and audit EJAZ for compliance with WAL-MART'S ETHICAL STANDARDS.

16.  On or about November 25, 2006, Intertek Testing Services Corp. (hereinafter "ITS"), an auditing firm contracted by WAL-MART, conducted an inspection and audit of EJAZ. The inspection and audit found approximately 18 labor, wage, health, safety and environmental violations of Pakistani law. Such violations are also violations of WAL-MART'S ETHICAL STANDARDS. A written report was issued (attached as Exhibit B) and given to BLUE MARLIN and DEFENDANTS on or about January 23, 2007.

17.  Shortly after BLUE MARLIN and DEFENDANTS received notice of the violations, HUSSAIN told Ashley and Mayfield that he was aware of the violations at EJAZ and had seen the report. During that conversation, Ashley and Mayfield told HUSSAIN that WAL-MART would cease doing business with BLUE MARLIN if DEFENDANTS did not quickly rectify the violations of WAL-MART'S ETHICAL STANDARDS at EJAZ. HUSSAIN told Ashley and Mayfield that he was aware of this and assured Mr. Ashley and Mayfield that

1  DEFENDANTS would ensure that any and all labor, wage, health, safety and environmental
2  violated were rectified. Ashley and Mayfield told HUSSAIN that BLUE MARLIN did
3  $10,000,000 of business with WAL-MART annually, and that such violations would severely
4  endanger this business. HUSSAIN told Ashley and Mayfield not to worry about the violations at
5  EJAZ, that the violations would be rectified.

6      18.    In approximately March 2007, HUSSAIN told Ashley and Mayfield that the
7  violations of WAL-MART'S ETHICAL STANDARDS at EJAZ had been rectified.

8      19.    On or about April 4, 2007, WAL-MART conducted a second inspection and
9  audit of EJAZ. The inspection and audit found further violations of Pakistani law and WAL-
10 MART'S ETHICAL STANDARDS; substantially the same violations which were found in
11 November 2006. A report was issued on or about May 8, 2007 (see Exhibit C).

12     20.    On or about April 30, 2007, WAL-MART informed BLUE MARLIN that it
13 would be ordering no further product from BLUE MARLIN, citing violations at EJAZ as the
14 reason therefore.

15     21.    Based on DEFENDANTS' interference with BLUE MARLIN's business
16 relationship with WAL-MART and breach of the CONTRACTS, BLUE MARLIN has incurred
17 losses of $16,000,000, after deducting, *inter alia*, the cost of goods, marketing, design,
18 development and distribution.

19              **IV.    PLAINTIFF'S CAUSES OF ACTION**

20                       **FIRST CAUSE OF ACTION**

21   **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

22     As a separate and distinct claim for relief, BLUE MARLIN brings the First Cause of
23 Action against DEFENDANTS for Negligent Interference with Prospective Economic
24 Advantage, by alleging the following:

25     22.    BLUE MARLIN hereby incorporates by reference all of the above paragraphs as
   though set forth here in full.

23. BLUE MARLIN and WAL-MART were in economic relationship that would have resulted in a great economic benefit for BLUE MARLIN.

24. DEFENDANTS knew of BLUE MARLIN's economic relationship with WAL-MART.

25. DEFENDANTS knew or should have known that BLUE MARLIN's economic relationship with WAL-MART would be disrupted if DEFENDANTS failed to act with reasonable care.

26. DEFENDANTS failed to act with reasonable care by telling BLUE MARLIN that EJAZ was compliant with WAL-MART'S ETHICAL STANDARDS when it knew or should have known that it was not.

27. As a result of DEFENDANTS' failure to act with reasonable care, BLUE MARLIN's economic relationship with WAL-MART was disrupted and BLUE MARLIN was substantiallly harmed.

28. As a result of DEFENDANTS' negligence, BLUE MARLIN's future business with WAL-MART was cancelled and the business relationship between BLUE MARLIN and WAL-MART terminated. As a proximate result of DEFENDANTS' negligence, BLUE MARLIN has lost $16,000,000 in business with WAL-MART.

## SECOND CAUSE OF ACTION

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

As a separate and distinct claim for relief, BLUE MARLIN brings the Second Cause of Action against DEFENDANTS for Intentional Interference with Prospective Economic Advantage, by alleging the following:

29. BLUE MARLIN hereby incorporates by reference all of the above paragraphs as though set forth here in full.

30. BLUE MARLIN and WAL-MART were in economic relationship that would have resulted in a great economic benefit for BLUE MARLIN.

31. DEFENDANTS knew of BLUE MARLIN's economic relationship with WAL-MART.

32. DEFENDANTS intended to disrupt BLUE MARLIN's relationship with WAL-MART by deceiving BLUE MARLIN about EJAZ's failure to comply with WAL-MART'S ETHICAL STANDARDS.

33. At all relevant times, DEFENDANTS knew or should have known that EJAZ was not in compliance with WAL-MART'S ETHICAL STANDARDS. DEFENDANTS knew that since EJAZ failed to comply with WAL-MART'S ETHICAL STANDARDS, that WAL-MART would severe its economic relationship with BLUE MARLIN. Nonetheless, DEFENDANTS repeatedly assured BLUE MARLIN that EJAZ was compliant with WAL-MART'S ETHICAL STANDARDS, when it was not and it knew or should have known it was not.

34. As a result of DEFENDANTS' willful and intentional conduct, WAL-MART terminated its economic relationship with BLUE MARLIN, resulting in the lost of all future profit from sales to WAL-MART. As a proximate result of DEFENDANTS' intentional conduct, BLUE MARLIN has lost $16,000,000 in business with WAL-MART.

### THIRD CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

As a separate and distinct claim for relief, BLUE MARLIN brings the Third Cause of Action against DEFENDANTS for Negligent Misrepresentation, by alleging the following:

35. BLUE MARLIN hereby incorporates by reference all of the above paragraphs as though set forth here in full.

36. In or around late July 2006, DEFENDANTS, through DEFENDANTS' representatives, represented to BLUE MARLIN that its designated factory was in compliance with WAL-MART'S ETHICAL STANDARDS. DEFENDANTS also represented that

DEFENDANTS had done business with WAL-MART previously and were familiar with WAL-MART'S ETHICAL STANDARDS. When DEFENDANTS made these representations they had no reasonable basis for believing them to be true. In fact, DEFENDANTS' designated factory, EJAZ, was in violation of **[JACOB: DON'T KNOW HOW TO COUNT THESE]** of WAL-MART'S ETHICAL STANDARDS.

37. Approximately a few weeks before April 4, 2007, DEFENDANTS were informed that WAL-MART would be conducting a second audit and inspection of EJAZ. DEFENDANTS failed to disclose to BLUE MARLIN that EJAZ was still in serious violation of **[JACOB: DON'T KNOW HOW TO COUNT THESE]** of WAL-MART'S ETHICAL STANDARDS. DEFENDANTS knew that these violations would result in WAL-MART terminating its economic relationship with BLUE MARLIN. DEFENDANTS made these false assertions despite the fact that it had no reasonable basis for believing them to be true. DEFENDANTS knew that BLUE MARLIN would rely on its assertions regarding EJAZ's compliance with the ethical standards.

38. As a proximate result of DEFENDANTS' negligent misrepresentations and omissions of fact BLUE MARLIN was induced to enter into a contract with DEFENDANTS, resulting in damage to BLUE MARLIN in the amount of $16,000,000.

## FOURTH CAUSE OF ACTION

## INTENTIONAL MISREPRESENTATION

As a separate and distinct claim for relief, BLUE MARLIN brings the Fourth Cause of Action against DEFENDANTS for Intentional Misrepresentation, by alleging the following:

39. BLUE MARLIN hereby incorporates by reference all of the above paragraphs as though set forth here in full.

40. In or around late July 2006, DEFENDANTS, through DEFENDANTS' representatives, represented to BLUE MARLIN that its designated factory was in compliance with WAL-MART'S ETHICAL STANDARDS. DEFENDANTS also represented that

1  DEFENDANTS had done business with WAL-MART previously and were familiar with WAL-
2  MART'S ETHICAL STANDARDS. When DEFENDANTS made these representations they
3  knew the representations were false. In fact, DEFENDANTS' designated factory, EJAZ, was in
4  violation of WAL-MART'S ETHICAL STANDARDS.

5      41.   On or about January 23, 2007, WAL-MART forwarded the results of an audit and
6  inspection of EJAZ. The report indicated that EJAZ had approximately 18 violations of labor,
7  wage, health, safety and environmental law of Pakistan which were also violations of WAL-
8  MART'S ETHICAL STANDARDS. After receiving this report, DEFENDANTS told Ashley
9  and Mayfield not to worry about the violations because the factory would quickly remedy them
10 and be in compliance with WAL-MART'S ETHICAL STANDARDS. DEFENDANTS made
11 these misrepresentations with the intent that BLUE MARLIN rely upon them despite the fact that
12 they intended to do nothing to remedy the violations. BLUE MARLIN relied on these
13 representations to its detriment.

14     42.   On or about April 4, 2007, WAL-MART conducted a second audit and inspection
15 of EJAZ. The results of the revealed that the factory had further labor, wage, health, safety and
16 environmental violations of Pakistani law and WAL-MART'S ETHICAL STANDARDS.
17 DEFENDANTS knew that EJAZ was not compliant with WAL-MART'S ETHICAL
18 STANDARDS and that DEFENDANTS had done nothing to remedy the violations since the last
19 audit and inspection on or about November 25, 2006. DEFENDANTS acts were conducted with
20 the intentional purpose of deceiving and defrauding BLUE MARLIN into retaining
21 DEFENDANTS as its manufacturer.

22     43.   As a direct and proximate result of DEFENDANTS' fraudulent conduct and false
23 statements, BLUE MARLIN'S GOODS were not reordered and WAL-MART terminated its
24 economic relationship with BLUE MARLIN, resulting in loss profit in the sum of $16,000,000.
25

44.  The conduct of DEFENDANTS was an intentional act of fraud and deceit in specific and conscious disregard of BLUE MARLIN's rights so as to justify an award of exemplary and punitive damages.

## FIFTH CAUSE OF ACTION

## BREACH OF CONTRACT

As a separate and distinct claim for relief, BLUE MARLIN brings the Fifth Cause of Action against DEFENDANTS for Breach of Contract, by alleging the following:

45.  BLUE MARLIN hereby incorporates by reference all of the above paragraphs as though set forth here in full.

46.  DEFENDANTS and BLUE MARLIN entered into CONTRACTS for the manufacture of the GOODS.

47.  DEFENDANTS promised, as a term of the CONTRACTS, to produce GOODS in a factory that was in compliance with WAL-MART'S ETHICAL STANDARDS.

48.  DEFENDANTS materially breached the CONTRACTS by producing the GOODS with a factory that was in serious violation of Pakistani law and WAL-MART'S ETHICAL STANDARDS. Compliance of DEFENDANTS' designated factory was a condition precedent for DEFENDANTS' manufacture of the GOODS and fulfillment of the CONTRACTS.

49.  BLUE MARLIN has performed all of its obligations under the CONTRACTS, except those that are waived, excused or unenforceable.

50.  As a direct and proximate result of DEFENDANTS' material breaches of the contracts, BLUE MARLIN has suffered damages in an amount subject to proof but not less than $16,000,000.

## SIXTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICE

1   As a separate and distinct claim for relief, BLUE MARLIN brings the Sixth Cause of
2   Action against DEFENDANTS for Unfair Business Practices, by alleging the following:

3   51.   BLUE MARLIN hereby incorporates by reference all of the above paragraphs as though set forth here in full.

52.   For all relevant times, DEFENDANTS engaged in the unfair business practices of intentionally and/or negligently deceiving BLUE MARLIN as described in above paragraphs.

53.   BLUE MARLIN pleads for injunctive relief in the form of an order mandating DEFENDANTS to cease all such practices and disgorge all profits made from such practices.

## V. PRAYER FOR RELIEF

Within WHEREFORE, plaintiff respectfully prays for judgment against defendant as follows.

1.   For compensatory damages in the amount of $16,000,000;
2.   For interest thereon at the legal rate of 10% per annum;
3.   For costs of suit incurred herein;
4.   For punitive and exemplary damages
5.   For attorney's fees incurred in this action;
6.   For nominal damages;
7.   For restitutionary relief;
8.   For injunctive relief;
9.   For such other and further relief as the Court deems just and equitable.

Date: August ____, 2006                                                SOMMERS LAW GROUP

Respectfully submitted,

STEPHEN A. SOMMERS
Attorney for Plaintiff